## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JENNIFER C. WATKINS,** | : | **Civil No.  1:22-CV-37** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **KILOLO KIJAKAZI,** | : | |
| **Acting Commissioner of Social Security** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

### I.    Introduction

Jennifer Watkins' Social Security appeal calls upon us to consider longstanding principles regarding the duty of an Administrative Law Judge (ALJ) to fully articulate the basis of a residual functional capacity (RFC) assessment, particularly when that RFC rejects the medical opinions on the record before the ALJ. We are then invited to apply these settled tenets to the Commissioner's current regulations governing the evaluation of medical opinions.

Watkins asserted that she was disabled due to a number of impairments, including fibromyalgia. Her treating physician and a Certified Registered Nurse Practitioner ("CRNP") both opined as to Watkins' limitations from this impairment. Most notably, Dr. Thomas Wallace, M.D., the plaintiff's treating doctor who had

diagnosed her with fibromyalgia in 2013, opined that Watkins was severely limited due to her fibromyalgia, and that this impairment rendered her disabled.

In denying Watkins' disability application, the ALJ gave these opinions little weight, reasoning that they were not consistent with the longitudinal treatment records. Notably, with respect to her fibromyalgia, the opinions of these treating practitioners are the only medical opinions which discuss Watkins' fibromyalgia and her limitations from this impairment. The ALJ then fashioned an RFC that limited Watkins to a range of light work with additional postural and environmental limitations that exceeded these two treating opinions.

In this case we most certainly do not write on a blank slate. Rather, this ALJ decision was the third decision rendered in Watkins' case, the first two decisions having been remanded by this court. In fact, the first two decisions were remanded for the same reason that the plaintiff now contends this third decision should be remanded—the ALJ's assessment of these treating opinions and the plaintiff's credibility. What is particularly troubling is that these opinions, one from Watkins' treating physician, were the only opinions rendered as to Watkins' fibromyalgia and related limitations. Because Watkins' claim was filed before the new regulations took effect in March of 2017, the opinions of a treating physician such as Dr. Wallace are generally entitled to great weight absent evidence in the record that is

2

inconsistent with the opinion. Moreover, while the ALJ in this third decision based his treatment of this opinion evidence on physical examination findings during the relevant period, as Judge Conaboy stated when he remanded the first decision, "normal examination findings are of little relevance in reviewing a claim based on pain and fatigue from fibromyalgia." Watkins v. Colvin, Civ. No. 3:16-CV-367 (M.D. Pa. Sept. 7, 2016) (collecting cases) (Tr. 499).

Accordingly, mindful of the fact that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant," and recognizing that "even though an ALJ is not bound to accept the statements of any medical expert, he may not substitute his own judgment for that of a physician," Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013), we conclude that the ALJ's burden of articulation has not been met in this the third appeal of this case spanning the past decade. We further conclude that given the posture of this case, having been remanded twice over a span of nearly a decade, it is now time for this painfully prolonged litigation to draw to a close. Finding that the exacting requirements set by law for an award of benefits are met under the extraordinary circumstances of this case, for the reasons set forth below, it is ordered that judgment

3

is entered in favor of the plaintiff and the Commissioner is directed to award benefits in this case.

## II.    Statement of Facts and of the Case

On May 6, 2013, Jennifer Watkins applied for disability insurance benefits alleging that she was totally disabled as of February 21, 2013, due to a number of impairments, including fibromyalgia. (Tr. 81, 446). Watkins was 36 years old at the time of the alleged onset of her disability. (Tr. 81). The symptoms of fibromyalgia claimed by the plaintiff were well documented in Watkins' treatment records during the relevant period.[1]

On this score, Watkins was diagnosed with fibromyalgia by Dr. Wallace, her treating physician, in December of 2012. (Tr. 230). It was noted that Watkins was to begin seeing a rheumatologist for her pain. (Id.) Dr. Wallace noted that a musculoskeletal examination revealed "multiple trigger points consistent with fibromyalgia." (Id.) In February of 2013, treatment notes indicate that Watkins has "quite a bit of pain through her body," and Dr. Wallace again noted multiple trigger points consistent with fibromyalgia. (Tr. 236). He started her on Gabapentin. (Id.) Less than one week later, Dr. Wallace's notes indicate that Watkins was unable to

---

[1] Given that we are finding in favor of the plaintiff based upon the ALJ's treatment of the opinion evidence regarding Watkins' fibromyalgia, we limit our discussion to the records regarding that impairment during the closed period of disability.

sit in the car or a chair for a while without experiencing pain, and he opined that "[t]here is no way she could work right now, certainly not full time and maybe not even four hours a day." (Tr. 238). At a follow up appointment in April of 2013, Watkins complained of pain and swelling in her arms, and it was noted that she was experiencing depression due to her fibromyalgia pain. (Tr. 244).

In May of 2013, treatment notes from Dr. Wallace indicate that Watkins was let go from her job because they could not offer her anything that was only four hours per day at work. (Tr. 246). It was noted that Watkins was very tired and sore, and he further noted "[re]quisite trigger point tenderness positive for fibromyalgia." (Id.) Dr. Wallace started her on new medication. (Id.) At a follow up appointment in July, Watkins reported having good and bad days with her fibromyalgia, but that she has pain all over. (Tr. 335). In September of 2013, Watkins treated with Dr. Keith Shenberger, M.D., at SHMG Rheumatology. (Tr. 309). It was noted that Watkins was sore and tender all over, and a physical examination revealed tenderness and pain in her right shoulder, right elbow, left elbow, and both knees. (Tr. 309-11). At a follow-up appointment in October, Dr. Wallace increased her Flexeril. (Tr. 340).

In February of 2014, CRNP Jamie Ficks treated Watkins at a follow-up appointment, where it was noted that Watkins was going to the gym but had overdone her exercise and was experiencing a fibromyalgia flare up. (Tr. 350). Her

physical examination revealed generally normal findings, but CRNP Ficks advised Watkins to continue to exercise but rest when she had flare ups. (Tr. 351). At a visit in April of 2014, CRNP Ficks noted that Watkins was having more fibromyalgia-related pain and her Gabapentin was not working anymore. (Tr. 356). CRNP Ficks added Lyrica to her medication regimen, and further noted that if her pain continued, she may need a referral to Pain Management. (Tr. 358).

On this score, CRNP Ficks filled out a physical capacity assessment form in April of 2014, in which she opined that Watkins could lift a maximum of 20 pounds; could sit, stand, walk, and drive for one hour or less; should avoid carrying, squatting, climbing, twisting, pushing, and pulling; would require unscheduled breaks throughout the workday; and would likely be absent more than 2 days per month. (Tr. 333). A notation made in July of 2014 indicated that Dr. Wallace agreed with CRNP Fick's assessment of Watkins' physical capacity at this time. (Tr. 365).

Watkins continued to treat with Dr. Wallace in September of 2014. (Tr. 858). It was noted that Watkins had joint and muscle pain daily. (Id.) In November of 2014, Watkins complained of a swollen and painful right arm. (Tr. 863). It was noted that Watkins had significant fibromyalgia pain. (Id.) A physical examination revealed tenderness in her left forearm and diminished grip strength. (Id.) Dr. Wallace's assessment was that her pain was fibromyalgia-related, "as she really does

seem to be point tender in the forearm." (Tr. 864). A treatment note from December 2014 indicates that Watkins' pain from her fibromyalgia made it difficult for her to do things. (Tr. 866).

Watkins began treating with Dr. Shenberger again in June of 2015, and Dr. Shenberger noted that Watkins had stopped treatment with him because she was unable to afford it at the time. (Tr. 625). She complained of pain all over and feeling tired constantly, and her musculoskeletal examination revealed tenderness on all typical trigger points. (Tr. 625, 627). At a visit with Dr. Wallace in July, Watkins reported having an "achy" day, and Dr. Wallace wanted to add Lyrica back onto her medication regimen. (Tr. 871). However, Lyrica was not covered by her insurance, and so Dr. Wallace continued Watkins' current medication regimen. (Tr. 872). In August, Watkins reported continuing problems with fatigue and fibromyalgia pain, which prompted Dr. Wallace to note that "she, really, is disabled from this. She has a hard time doing common household chores such as washing dishes, etc." (Id.) It was noted in December that she was still having fibromyalgia pain, and in January of 2016, Watkins reported that her fibromyalgia was flaring up a lot. (Tr. 878, 882).

Throughout 2016, Watkins continued to report her fibromyalgia pain and flare ups. (Tr. 894, 900, 906). In March of 2016, she reported a flare up to Dr. Wallace after having to clean her house because of a bedbug issue. (Tr. 894). In June, she

reported getting "wiped out easily" from her fibromyalgia. (Tr. 900). In September, Watkins reported swelling and pain. (Tr. 903). It was noted that she had walked the day before, and that her pain was bad, but it became worse when she woke up the next day. (Id.) In October, she reported that her Gabapentin was ineffective, and it was noted that she was walking but experienced pain. (Tr. 906). She also reported continued fatigue and tiredness due to her fibromyalgia. (Id.) A treatment note from April of 2017 indicated that Watkins had undergone back surgery, and that her fibromyalgia had flared up after the surgery. (Tr. 923-24).

Thus, throughout the relevant period, Watkins' treating physician, along with CRNP Ficks, consistently noted her ongoing symptoms of fibromyalgia. Moreover, and significantly, Dr. Wallace repeatedly stated his opinion that this condition was disabling. In addition to the physical capacity assessment in 2014, Dr. Wallace filled out a similar form in March of 2019, albeit after the relevant period. (Tr. 1071). This physical capacity assessment opined that Watkins had similar limitations as found in the 2014 assessment, in that she was limited to lifting a maximum of 20 pounds; sitting, standing, walking, and driving for one hour or less; avoiding pushing, pulling, grasping, and fine manipulation, as well as being, squatting, twisting, and kneeling; and that she would require unscheduled breaks during a workday and would likely be absent more than 2 days per month. (Id.) Around this same time, Dr.

Edward Dempsey, D.O., whom the plaintiff treated with for her hypersomnia, also opined that Watkins could drive for only one hour or less, and that she would need unscheduled breaks during the workday. (Tr. 1068). Notably, there are no other medical opinions in the record that contradict these treating source opinions.

It was against this clinical backdrop that an ALJ conducted a third hearing regarding Watkins's disability application on September 2, 2021 and a supplemental hearing on October 5, 2021. (Tr. 1109-23, 1124-48). Watkins and a vocational expert both appeared and testified. (Id.) In her testimony, Watkins described the severity of her fibromyalgia symptoms in terms that were entirely consistent with the consensus views of her treatment providers. On this score, she testified that when she was working for four hours a day in 2013, she had pain from sitting down and pain in her arms from typing. (Tr. 1137). She stated that she had to take extra breaks so that she could get up. (Id.) She testified that this led her employer to let her go because she missed days and took extra breaks. (Tr. 1138). She reported that when she experienced pain, she would either have to take medication or sleep to feel any relief. (Tr. 1139). She further testified that she could maybe carry a gallon of milk but could not carry a laundry basket. (Tr. 1144). She stated that on a good day, she could stand for about 30 minutes, walk around one block, and sit for 30 minutes before having to switch positions. (Tr. 1145).

Following this hearing on November 3, 2021, the ALJ issued a decision denying Watkins's application for benefits. (Doc. 1080-1101). In that decision, the ALJ first concluded that Watkins satisfied the insured status requirements of the Act through December 31, 2017. (Tr. 1085). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Watkins suffered from the following severe impairments: fibromyalgia; lumbar degenerative disc disease; lumbar herniated nucleus pulpous, laminectomy syndrome status post lumbar laminectomy L5-S1 right discectomy; chronic obstructive pulmonary disorder (COPD); obstructive sleep apnea; nocturnal hypoxemia; diabetes mellitus; diabetic neuropathy; and obesity. (Tr. 1086).  At Step 3 the ALJ determined that Watkins did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 1089-91). Regarding her fibromyalgia, the ALJ considered SSR 12-2p, but found that Watkins did not satisfy the requirements for listing-level severity. (Tr. 1091).

The ALJ then fashioned an RFC that contradicted and rejected all of the medical opinions of record, finding that Watkins

> [H]ad the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following limitations: No more than frequent use of foot controls with the bilateral lower extremities. Further, no more than frequent reaching handling, fingering, and feeling with the bilateral upper extremities. In addition, she is limited to no more than occasional balancing, stooping, kneeling, crouching,

crawling, and climbing on ramps and stairs, but may never climb on ladders, ropes, or scaffolds. Also, she is limited to occasional operation of a motor vehicle, no more than occasional exposure to concentrated atmospheric conditions, extreme cold, heat, wetness, and humidity and may never be exposed to vibration and hazards such as unprotected heights and dangerous moving mechanical parts.

(Tr. 1091-92).

In reaching this conclusion, the ALJ essentially discounted all of the medical expert opinions. Thus, the ALJ considered Dr. Wallace's opinion from 2013 that limited Watkins to working for only 4 or 5 hours per day and gave this opinion little weight, relying in part normal physical examination findings. (Tr. 1096). The ALJ also relied on the fact that Dr. Wallace did not identify specific trigger points at this time. (Id.) The ALJ also gave CRNP Ficks' 2014 physical capacity assessment little weight. (Id.) Again, the ALJ relied on the lack of identification of specific trigger points, as well as the lack of abnormal examination findings relating to Watkins' fibromyalgia. (Id.) The ALJ further considered Dr. Wallace's 2019 opinion, that while rendered after the date last insured mirrored the physical capacity assessment from 2014, and gave this opinion little weight, reasoning that it was rendered after the claimant's date last insured. (Id.)

The ALJ also considered Watkins' testimony but found that her statements regarding her symptoms were not persuasive. (Tr. 1095). The ALJ noted that there were times Watkins went to the gym and used a snowblower during the relevant

11

period, as well as cleaning her house after a bedbug incident in 2016. (Id.)  The ALJ also noted evidence in the medical record which indicated positive trigger points but did not identify specific trigger points. (Tr. 1093).

Having rejected these medical opinions that were largely consistent with Watkins' subjective complaints regarding her fibromyalgia, the ALJ crafted this residual functional capacity assessment for Watkins based largely upon his own lay evaluation of the medical evidence, in a manner that contradicted every treating source opinion, stating that the record as a whole did not support any greater limitations than those outlined in the RFC. (Tr. 1095).

The ALJ then found that Watkins could perform her past work as a secretary, and further, that she could perform work available in the national economy as an office helper, rental clerk, and routing clerk. (Tr. 1098, 1100). Notably, at the supplemental administrative hearing, the Vocational Expert was asked to identify jobs that would be available if Watkins was limited to the RFC as set forth by her treating physician which included unscheduled breaks and being absent more than two days per month, and the Vocational Exert testified that those limitations would preclude all work. (Tr. 1120-21). Having reached these conclusions, the ALJ determined that Watkins had not met the demanding showing necessary to sustain his claim for benefits and denied this claim. (Tr. 26).

This third disability appeal followed. (Doc. 1). On appeal, Watkins challenges the adequacy of the ALJ's explanation of this RFC determination, which rejected every medical source opinion in favor of a lay assessment of the clinical evidence by the ALJ. While the Commissioner contends that the ALJ properly assessed the medical opinions of Dr. Wallace, we disagree. Rather, under the controlling regulations at the time, Dr. Wallace's opinion would generally be entitled to great or even controlling weight, absent evidence to contradict his opinion. Moreover, the regulations do not relieve the ALJ of the responsibility of adequately articulating the basis for a medical opinion evaluation.

In our view, this case illustrates the settled principles that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant," and "even though an ALJ is not bound to accept the statements of any medical expert, he may not substitute his own judgment for that of a physician," Biller, 962 F. Supp. 2d at 778–79. As discussed below, we conclude that the ALJ's burden of articulation has not been met in this appeal. Moreover, we find that the standard for an award of benefits has been met in the unique circumstances of this case where despite three separate appeals of this closed period claim the Commissioner has yet to cite any substantial evidence which contradicts the treating source consensus that Watkins is

disabled. Accordingly, we will order that the decision of the Commissioner be reversed in this case, and that benefits be awarded to the plaintiff.

## III.   <u>Discussion</u>

### A.   <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. See 42 U.S.C. §405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F. Supp.2d 533, 536 (M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision]

14

from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n,

383 U.S. 607, 620 (1966).  "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D.Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in

this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout
> administrative law to describe how courts are to review agency
> factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——,
> 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-
> evidence standard, a court looks to an existing administrative record
> and asks whether it contains "sufficien[t] evidence" to support the
> agency's factual determinations. Consolidated Edison Co. v. NLRB,
> 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis
> deleted). And whatever the meaning of "substantial" in other contexts,
> the threshold for such evidentiary sufficiency is not high. Substantial
> evidence, this Court has said, is "more than a mere scintilla." Ibid.; see,
> e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks
> omitted). It means—and means only—"such relevant evidence as a
> reasonable mind might accept as adequate to support a conclusion."
> Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v.
> Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999)
> (comparing the substantial-evidence standard to the deferential clearly-
> erroneous standard).

Biestek, 139 S. Ct. at1154.

The question before this Court, therefore, is not whether the claimant is

disabled, but rather whether the Commissioner's finding that she is not disabled is

supported by substantial evidence and was reached based upon a correct application

of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford, 399 F.3d at 552). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

In <u>Burnett</u>, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. <u>Id</u>. at 120; <u>see Jones v. Barnhart</u>, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "<u>Burnett</u> does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." <u>Jones</u>, 364 F.3d at 505.

<u>Diaz v. Comm'r of Soc. Sec.</u>, 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

### B.   <u>Initial Burdens of Proof, Persuasion, and Articulation for the ALJ</u>

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); <u>see also</u> 20 C.F.R. §§404.1505(a), 416.905(a).  To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful

activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this

assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

Once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC.  20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

19

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and state that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller, 962 F.Supp.2d at 778–79 (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F.Supp.3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize

the importance of medical opinion support for an RFC assessment typically arise in the factual setting, like that presented here,  where well-supported medical sources have opined regarding limitations which would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when no medical opinion supports a disability finding or when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington, 174 F. App'x 6; Cummings, 129 F.Supp.3d at 214–15. In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113; see also Metzger v. Berryhill, 2017 WL 1483328, at *5; Rathbun v. Berryhill, 2018 WL 1514383, at *6.

21

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

**C.    Legal Benchmarks for the ALJ's Assessment of Medical Opinions**

The Commissioner's regulations in effect at the time that Watkins filed this disability application in 2013 also set standards for the evaluation of medical evidence and define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite

impairments(s), and [a claimant's] physical or mental restrictions." 20 C.F.R. §404.1527(a)(2). Regardless of its source, the ALJ is required to evaluate every medical opinion received. 20 C.F.R. §404.1527(c).

In deciding what weight to afford competing medical opinions and evidence, the ALJ is guided by factors outlined in 20 C.F.R. §404.1527(c). "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96-6p, 1996 WL 374180 at *2. Treating sources have the closest ties to the claimant, and therefore their opinions generally entitled to more weight. See 20 C.F.R. §404.1527(c)(2) ("Generally, we give more weight to opinions from your treating sources..."); 20 C.F.R. §404.1502 (defining treating source). Under some circumstances, the medical opinion of a treating source may even be entitled to controlling weight. 20 C.F.R. §§04.1527(c)(2); see also SSR 96-2p, 1996 WL 374188 (explaining that controlling weight may be given to a treating source's medical opinion only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with the other substantial evidence in the case record).

Where no medical source opinion is entitled to controlling weight, the Commissioner's regulations direct the ALJ to consider the following factors, where applicable, in deciding the weight given to any non-controlling medical opinions:

length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which the source presented relevant evidence to support his or her medical opinion, and the extent to which the basis for the source's conclusions were explained; the extent to which the source's opinion is consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention. 20 C.F.R. §404.1527(c). These benchmarks, which emphasize consideration of the nature of the treating relationship, also call for careful consideration of treating source opinions.

Indeed, this court has often addressed the weight which should be afforded to a treating source opinion in a Social Security disability appeals and emphasized the importance of such opinions for informed decision-making in this field. Recently, we aptly summarized the controlling legal benchmarks in this area in the following terms:

> Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight. See, e.g., Fargnoli v. Massanari, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 CFR § 404.1527(c)(2); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)). Oftentimes referred to as the "treating physician rule", this principle is codified at 20 CFR 404.1527(c)(2), and is widely accepted in the Third Circuit. Mason v. Shalala, 994 F.2d 1058 (3d Cir. 1993); See also Dorf v. Bowen, 794 F.2d 896 (3d Cir. 1986). The regulations also address the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory

24

diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight." 20 CFR § 404.1527(c)(2). "A cardinal principle guiding disability, eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted); See also Brownawell v. Commissioner of Social Security, 554 F.3d 352, 355 (3d Cir. 2008). In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation, or lay opinion." Morales v. Apfel, supra at 317.

Morder v. Colvin, No. 3:16-CV-213, 2016 WL 6191892, at *10 (M.D. Pa. Oct. 24, 2016).

Thus, an ALJ may not unilaterally reject a treating source's opinion and substitute the judge's own lay judgment for that medical opinion. Instead, the ALJ typically may only discount such an opinion when it conflicts with other objective tests or examination results. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 202–03 (3d Cir. 2008). Likewise, an ALJ may conclude that discrepancies between the treating source's medical opinion and the doctor's actual treatment notes justifies giving a treating source opinion little weight in a disability analysis. Torres v. Barnhart, 139 F. App'x 411, 415 (3d Cir. 2005). Finally, "an opinion from a treating source about what a claimant can still do which would seem to be well-supported by the objective findings would not be entitled to controlling weight if there was other

substantial evidence that the claimant engaged in activities that were inconsistent with the opinion." Tilton v. Colvin, 184 F.Supp.3d 135, 145 (M.D. Pa. 2016). However, in all instances in social security disability cases the ALJ's decision, including any ALJ judgments on the weight to be given to treating source opinions, must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter, 642 F.2d at 704. Indeed, this principle applies with particular force to the opinion of a treating physician. See 20 C.F.R. §404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion"). "Where a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or the wrong reason.'" Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (quoting Mason, 994 F.2d at 1066)); see also Morales, 225 F.3d at 317. Therefore, the failure on the part of an ALJ to fully articulate a rationale for rejecting the opinion of a treating source may compel a remand for further development and analysis of the record.

### D.   The ALJ's Opinion is Not Supported by Substantial Evidence.

This case presents a striking circumstance. In fashioning an RFC for the plaintiff and denying this disability claim, the ALJ has essentially rejected every treating source medical opinion. Instead, relying upon a subjective evaluation of

Watkins' treatment records, the ALJ crafted an RFC that is unhinged to any medical opinion and contradicts all of the medical opinions in the administrative record. The ALJ has also rejected a treating source consensus from two different medical sources who had cared for Watkins over a span of years and had found Watkins's fibromyalgia symptoms to be disabling. In our view, the ALJ's justification for this course of action—which consisted of vague and conclusory references to normal examination findings—is insufficient to justify discounting the medical opinions of these treatment providers, particularly where these limitations, if credited, would have precluded all work in Watkins' case according to the Vocational Expert. Therefore, we find that substantial evidence does not support the ALJ's decision in this case.

We are not alone in reaching these conclusions. Quite the contrary, we are constrained to note that our conclusion with respect to this third ALJ decision mirrors the conclusions of the district court's remand of the initial ALJ opinions in this case. Indeed, in remanding the first ALJ decision, Judge Conaboy found that ALJ Wolfe failed to properly consider Dr. Wallace's opinion with respect to Watkins' fibromyalgia when she discounted this opinion relying on objectively normal examination findings:

> Certainly the record reveals clinical documentation of Plaintiff's symptoms and her treating physician reported on the severity of her

27

condition, important factors in evaluating a case involving fibromyalgia. <u>Singleton [v. Astrue]</u>, 542 F. Supp. 2d[, 367,] at 378 [D. Del. 2008))]; SSR 12-2p. Significantly, normal examination findings are of little relevance in reviewing a claim based on pain and fatigue from fibromyalgia. <u>See, e.g.</u>, <u>Smith [v. Comm'r of Soc. Sec.,</u>] 2009 WL 2762687, at *4 [(W.D. Pa. Aug. 31, 2009)] (where treating physician had diagnosed fibromyalgia, normal examination findings did not constitute substantial evidence supporting ALJ's denial of claim); <u>see also</u> <u>Yerk v. Astrue</u>, Civ. A. No. 2:07-CV1601, 2009 WL 195991, at *9 (W.D. Pa. Jan. 26, 2009) (objective "substantially normal findings" in no way inconsistent with diagnosed fibromyalgia). Thus, examination findings within normal limits are inconsequential, as are ALJ Wolfe's references to the lack of sensory or gait deficits and range of motion deficits, as reasons to discount assessments made by Dr. Wallace regarding Plaintiff's limited work abilities.

<u>Watkins v. Colvin</u>, Civ. No. 3:16-CV-367 (M.D. Pa. Sept. 7, 2016) (Tr. 498-99).

In addition, in remanding the second decision by ALJ Wolfe, Magistrate Judge Cohn found that the ALJ erred when she failed to credit any medical opinion in the record and instead relied on her own speculation and interpretation of the medical evidence. <u>Watkins v. Saul</u>, Civ. No. 1:19-CV-1632 (M.D. Pa. Sept. 25, 2020) (Tr. 1182). Judge Cohn specifically noted the ALJ's failure to account for the treating source opinions regarding the need for unscheduled breaks. (<u>Id.</u>) This Report and Recommendation was adopted by Judge Kane, and the case was remanded on a second occasion for further consideration. (Tr. 1188-89).

Yet, on appeal from this remand which resulted in a third decision denying Watkins' application, we are faced with the same error. Indeed, this third decision

by the ALJ suffers from the same flaw as the first two decisions. On this score, the ALJ gave little weight to Dr. Wallace's and CRNP Fick's opinions regarding Watkins' fibromyalgia. The ALJ discounted these opinions based on a lack of abnormal findings relating to her fibromyalgia. Notably, no medical opinion in the record contradicted the limitations set forth by these treating providers. In fact, the 2019 opinion of Dr. Dempsey, although rendered after the date last insured, is consistent with Dr. Wallace's and CRNP Fick's opinion that Watkins would need unscheduled breaks during the workday. The ALJ also discounted, to an extent, Watkins' testimony regarding her symptoms, finding that her statements were not consistent with the overall medical evidence.

More is needed here. Indeed, as Judge Conaboy noted in his decision remanding the first ALJ decision, fibromyalgia is "an elusive problem which poses special circumstances in the social security arena." Watkins, Civ. No. 3:16-CV-367 (Tr. 493). As one court in this district has aptly noted:

> [I]n a disability determination involving fibromyalgia, it is error to require objective findings when the disease itself eludes such measurement. See, e.g., Green–Younger, 335 F.3d at 108. Similarly, unverified subjective complaints consistent with the disease cannot be discredited for lack of objective evidence. Id. Rather, a doctor's diagnosis of fibromyalgia bolsters the credibility of the plaintiff's complaints. Id. "In stark contrast to the unremitting pain of which fibrositis (fibromyalgia) patients complain, physical examinations will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions." Lisa v.

> Secretary of the Dep't of Health and Human Services, 940 F.2d 40, 45
> (2d Cir. 1991). "Because objective tests may not be able to verify a
> diagnosis of fibromyalgia, the reports of treating physicians, as well as
> the testimony of the claimant, become even more important in the
> calculus for making a disability determination." Perl v. Barnhart, No.
> 03–4580, 2005 WL 579879, at *3 (E.D.Pa. Mar. 10, 2004) (citing
> Green–Younger, 335 F.3d at 108).

Foley v. Barnhart, 432 F.Supp.2d 465, 480 (M.D. Pa. 2005). See also Young v.

Colvin, 2015 WL 7871060, at *3-4 (W.D. Pa. Dec. 3, 2015) (remanding the

plaintiff's appeal based on the ALJ's rejection of a treating source opinion and the

plaintiff's subjective complaints regarding her fibromyalgia).

So it is here. In this case, the ALJ rejected the consistent opinions of Watkins'

treating physician, who opined during the relevant period that Watkins' was severely

limited due to her fibromyalgia. If credited, these limitations, according to the

Vocational Expert, would have precluded Watkins from working. The ALJ chose

not to credit these limitations set forth by Watkins' treating doctor and confirmed by

her own testimony, instead fashioning an RFC based upon examination findings that,

as we have noted, are not typically indicative of the severity of a claimant's

fibromyalgia symptoms. Settled case law has determined that this approach

constitutes both legal and medical error. In our view, more is needed by way of

explanation before an ALJ can reject all medical opinions in favor of his own

subjective evaluation of the treatment records. Accordingly, we cannot conclude that the ALJ's decision is supported by substantial evidence.

### E. **We Will Reverse the Decision of the Commissioner and Order that Benefits be Awarded to the Plaintiff.**

The Commissioner urges us to simply remand this decision for a fourth consideration by an ALJ, rather than accept the plaintiff's invitation to award her benefits for this closed period of disability. In considering these competing invitations regarding the course we should follow to remedy this latest, and admittedly flawed, ALJ ruling, we begin as we must with the language of the statute itself. Section 405(g) of Title 42, United States Code, defines the role of the court in reviewing Social Security disability determinations and provides that: "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405 (g).

Oftentimes the remedy prescribed by the court is the relief sought here by the Commissioner: a remand for further proceedings. Such relief is specifically authorized by statute, and given the deference owed to administrative agency decisions, is often appropriate. However, as the plain language of § 405(g) indicates, we are not limited to ordering a remand for further proceedings. Instead "[w]hen reversing the SSA's decision under 42 U.S.C. § 405(g), this Court 'may choose to

remand to the Secretary for a further hearing or simply...award benefits.'"
Brownawell v. Comm'r of Soc. Sec., 554 F.3d 352, 357–58 (3d Cir. 2008) (quoting
Podedworny v. Harris, 745 F.2d 210, 221 (3d Cir. 1984)).

While this judgment concerning the proper form of relief in a Social Security
appeal rests in the court's sound discretion, Podedworny, 745 F.2d at 221, the
exercise of our discretion in this field is guided by certain basic principles. As the
Court of Appeals has explained:

> The decision to direct the district court to award benefits should be
> made only when the administrative record of the case has been fully
> developed and when substantial evidence on the record as a whole
> indicates that the claimant is disabled and entitled to benefits. Tennant
> v. Schweiker, 682 F.2d 707, 710 (8th Cir. 1982); Lewin v. Schweiker,
> 654 F.2d 631, 635 (9th Cir. 1981). See Parsons v. Heckler, 739 F.2d
> 1334 at 1341 (8th Cir. 1984); Smith v. Heckler, 735 F.2d 312, 318 (8th
> Cir. 1984); Baugus v. Secretary of Health and Human Services, 717
> F.2d 443, 448 (8th Cir.1983); Rini v. Harris, 615 F.2d 625, 627 (5th
> Cir. 1980); Gold v. Secretary of H.E.W., 463 F.2d 38, 44 (2d Cir. 1972).
> When faced with such cases, it is unreasonable for a court to give the
> ALJ another opportunity to consider new evidence concerning the
> disability because the administrative proceeding would result only in
> further delay in the receipt of benefits.

Podedworny, 745 F.2d at 221–22.

Thus, in practice any decision to award benefits in lieu of ordering a remand
for further agency consideration entails the weighing of two factors: First, whether
there has been an excessive delay in the litigation of the claim which is not
attributable to the claimant; and second, whether the administrative record of the

case has been fully developed and substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits.

With respect to this first consideration, undue delay, courts measure this delay both in terms of the passage of years and by reference to whether there have been prior appeals and remands. Applying these temporal benchmarks, courts have found that administrative delays of five years or more in cases involving one or two prior remands have constituted excessive delays triggering consideration of an award of benefits in lieu of a remand. See e.g., Brownawell v. Comm'r of Soc. Sec., 554 F.3d 352, 358 (3d Cir. 2008) (8 years delay, and 2 prior remands, benefits awarded); Morales v. Apfel, 225 F.3d 310, 320 (3d Cir. 2000) (award of benefits ordered after 10 years and two appeals); Woody v. Sec'y of Health & Human Servs., 859 F.2d 1156, 1162 (3d Cir. 1988) (eight years of administrative and judicial proceedings, benefits awarded); Podedworny, 745 F.2d 210 (award of benefits after two appeals, 5½ years of delay); Halloran v. Berryhill, 290 F. Supp. 3d 307, 321 (M.D. Pa. 2017) (4 year delay, benefits awarded); Nance v. Barnhart, 194 F. Supp. 2d 302, 322 (D. Del. 2002) (7 years of delay in processing first appeal, benefits awarded); Schonewolf v. Callahan, 972 F. Supp. 277, 290 (D.N.J. 1997) (6 years of delay, 2 prior remands, benefits awarded).

As for the second benchmark standard we must consider, which examines the underlying merits of the plaintiff's claim, there are two components to this merits assessment. "The district court can award benefits only when [first] the administrative record of the case has been fully developed and [second] when substantial evidence on the record as a whole indicates that the plaintiff is disabled and entitled to benefits." Eberhart v. Massanari, 172 F. Supp. 2d 589, 599 (M.D. Pa. 2001) (citing Gilliland v. Heckler, 786 F.2d 178 (3d Cir. 1986); Tennant v. Schweiker, 682 F.2d 707, 710 (8th Cir. 1982)). These requirements are met whenever the court finds the record to be "extensive and well developed." Id. Likewise, these elements are satisfied if the court concludes that the medical opinion evidence in a case has been fully developed. Brownawell, 554 F.3d at 358. An award of benefits is also proper when the "extensive medical record, wrongly rejected by the ALJ, is substantial evidence that [a claimant is disabled]," Morales, 225 F.3d at 320, or when treatment records, coupled with a treating source's opinions over several years, indicates that the plaintiff is unable to maintain a normal, regular work schedule. Nance, 194 F. Supp. 2d at 322.

Finally, any evaluation of whether substantial evidence on the record as a whole indicates that the plaintiff is disabled and entitled to benefits should also take into account the procedural posture of a case, and particularly which party bears the

burden of proof and production on issues of disability. As a general rule, it is well settled that, while at steps one through four, the claimant bears the initial burden of proof, Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993), once this burden has been met, it shifts to the Commissioner at step five to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience, and RFC. Mason, 994 F.2d at 1064.

These are the legal cairns, or landmarks, that guide us as we choose between the divergent paths urged upon us by the parties and write the final chapter in this legal saga. For the reasons set forth below, we find that an award of benefits is appropriate in this case. We do not reach this decision lightly. Rather, our judgment regarding the future course of this litigation is formed, and informed, by the past history of this case, a history marked by prolonged delays coupled with repeatedly flawed analysis of a claim which draws substantial support from the administrative record. Moreover, in reaching this conclusion we are guided by the legal standards defined for us by the courts.

At the outset, we find that this case meets the "excessive delay" requirement. In reaching this conclusion we are mindful that courts have found administrative delays of five years or more in cases involving one or two prior remands have

constituted excessive delays triggering consideration of an award of benefits in lieu of a remand. See e.g., Brownawell, 554 F.3d at 358 (8 years delay, and 2 prior remands, benefits awarded); Morales, 225 F.3d at 320 (award of benefits ordered after 10 years and two appeals); Woody, 859 F.2d at 1162 (eight years of administrative and judicial proceedings, benefits awarded); Podedworny, 745 F.2d 210 (award of benefits after two appeals, 5½ years of delay); Halloran, 290 F. Supp. 3d at 321 (4 year delay, benefits awarded); Nance, 194 F. Supp. 2d at 322 (7 years of delay in processing first appeal, benefits awarded); Schonewolf, 972 F. Supp. at 290 (6 years of delay, 2 prior remands, benefits awarded).

The delays experienced here to date far exceed those previously found to have been excessive both in terms of the overall duration of this delay, and the number of instances in which the courts have been compelled to set aside flawed ALJ decisions. Indeed, at present, almost 10 years have elapsed since Watkins' onset date of disability in February of 2013, and since Watkins began the formal process of seeking these disability benefits in May of 2013.

Furthermore, the painfully protracted history of this litigation has been marked by no less than three ALJ decisions, each of which was flawed in ways which have compelled the courts to vacate these administrative judgments. Indeed, if we acceded to the Commissioner's suggestion and remanded this case, we would be

setting the stage for an extraordinary, fourth administrative decision in this case. This remand history is unprecedented and exceeds the record of remands that have previously been deemed excessive by the courts. Brownawell, 554 F.3d at 358 (8 years delay, and 2 prior remands, benefits awarded); Morales, 225 F.3d at 320 (award of benefits ordered after 10 years and two appeals); Woody, 859 F.2d at 1162 (eight years of administrative and judicial proceedings, benefits awarded); Podedworny, 745 F.2d 210 (award of benefits after two appeals, 5½ years of delay). Accordingly, given the delay that has occurred to date, and the future delay that would occur if this case were to be remanded for a fourth administrative hearing, we find that the first element of Watkins' request for the award of benefits in lieu of a remand—excessive delay—is fully met here.

Finding that this case has been plagued by excessive delay, we consider the next two issues we must address: Is the administrative record of the case fully developed and does substantial evidence on the record as a whole indicate that the claimant is disabled and entitled to benefits? Podedworny, 745 F.2d at 221–22. 1984). We answer both of these questions in the affirmative.

Turning first to the consideration of the completeness of the administrative record, that record embraces 1,685 pages of material which include hearing testimony, medical records, and medical opinions which span the four-year period

of this closed period disability claim. Moreover, the medical record as it pertains to Watkins' fibromyalgia is also extensive and fully developed. We again note that this claim presents a closed period of disability from February 21, 2013 to December 31, 2017. The administrative record regarding this period is comprised of comprehensive treatment records spanning from 2013 to 2017, along with at least three statements from Watkins' treating providers detailing the severity of her fibromyalgia symptoms and the limitations that she experiences due to this impairment. Further, we note that, had there been any evidentiary deficit in Watkins' medical history, the ALJ certainly had the discretion to cure that shortcoming by ordering a consultative examination during the three prior administrative proceedings in this case.[2] Moreover, at this time, allowing yet another remand likely would not allow for expansion of the medical record in any meaningful fashion since the relevant time period in this case closed six years ago in 2017, and it is highly unlikely that any medical source could opine in a meaningful way regarding the

---

[2] We note that while ALJ Wolfe solicited testimony from a medical provider at the second administrative hearing in 2019 regarding Watkins' fibromyalgia, that medical provider curiously opined that Watkins' fibromyalgia was not a medically determinable impairment, and ALJ Wolfe gave that opinion only partial weight, finding that Watkins' fibromyalgia was a severe impairment. The ALJ also received testimony from Dr. Wallace at this hearing, during which time he testified that Watkins' fibromyalgia had not had dramatic improvement with any of the treatments she had undergone. ALJ Wolfe found that Dr. Wallace's testimony did not support a finding of disability. (Tr. 1164-65).

nature of Watkins' health some six years earlier. Indeed, notably even as the Commissioner seeks a remand of this case, the agency does not identify for us any evidentiary gaps in the record which require further factual development. Therefore, we conclude that "the administrative record of the case has been fully developed." Eberhart, 172 F. Supp. 2d 589, 599 (M.D. Pa. 2001).

Finally, given this very complete administrative record we also conclude that "substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." Podedworny, 745 F.2d at 221–22. Accordingly, "it is unreasonable for a court to give the ALJ another opportunity to consider new evidence concerning the disability because the administrative proceeding would result only in further delay in the receipt of benefits." Id. We reach this conclusion mindful of the Commissioner's admonition that "the district courts have no fact-finding role in Social Security cases." Grant v. Shalala, 989 F.2d 1332, 1338 (3d Cir. 1993). Yet, we also recognize that, as the Supreme Court has recently observed:

> § 405(g) states that a reviewing "court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing"—a broad grant of authority that reflects the high "degree of direct interaction between a federal court and an administrative agency" envisioned by § 405(g).

Smith v. Berryhill, 139 S. Ct. 1765, 1779 (2019).

When considering whether to exercise this "broad grant of authority" under § 405(g) in favor of an award of benefits in lieu of a remand, for the past 35 years the clear guidance from the court of appeals has been that the court may award benefits "when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." Podedworny, 745 F.2d at 221–22.

Here, substantial evidence shows that Watkins was disabled during the relevant period and entitled to benefits. We find this to be particularly compelling in a case such as this, where we are faced with a closed period of benefits from 2013 to 2017, and the record as to that period of time has been fully developed. Indeed, during the relevant period, Watkins' treating physician consistently opined that Watkins was unable to work due to her fibromyalgia pain, and that she was severely limited in her activities of daily living. Dr. Wallace and CRNP Ficks opined that Watkins was limited in her ability to sit, stand, walk, or drive for more than an hour due to her pain; was limited in many postural activities such as stooping, bending, pushing, and pulling; would need unscheduled breaks during the workday; and would likely be absent from work for more than 2 days per month, limitations which the Vocational Expert in the third administrative hearing identified as being work-preclusive. These limitations were consistent with the opinion of Dr. Dempsey in

40

2019 that Watkins needed unscheduled breaks during the workday. Additionally, there is no evidence in the record—medical records or opinion evidence—that contradicts these treating providers' findings. Taken together this mutually corroborative and largely uncontradicted lay testimony and medical opinion evidence from multiple medical sources plainly constitutes "substantial evidence on the record as a whole [which] indicates that the claimant is disabled and entitled to benefits." Podedworny, 745 F.2d at 221–22.

Moreover, an assessment of this third ALJ decision in Watkins' case strongly suggests that it is flawed in numerous ways that could not be remedied through a remand. First, the ALJ's decision in this case, as well as the first two ALJ decision, ran afoul of a cardinal legal principle in this field, the treating physician rule. As we have observed:

> Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight. See, e.g., Fargnoli v. Massanari, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 CFR § 404.1527(c)(2); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)). Oftentimes referred to as the "treating physician rule", this principle is codified at 20 CFR 404.1527(c)(2), and is widely accepted in the Third Circuit. Mason v. Shalala, 994 F.2d 1058 (3d Cir. 1993); See also Dorf v. Bowen, 794 F.2d 896 (3d Cir. 1986). The regulations also address the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight." 20 CFR §

> 404.1527(c)(2). "A cardinal principle guiding disability, eligibility
> determinations is that the ALJ accord treating physicians' reports great
> weight, especially when their opinions reflect expert judgment based
> on continuing observation of the patient's condition over a prolonged
> period of time." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000)
> (citations omitted); See also Brownawell v. Commissioner of Social
> Security, 554 F.3d 352, 355 (3d Cir. 2008). In choosing to reject the
> treating physician's assessment, an ALJ may not make "speculative
> inferences from medical reports and may reject a treating physician's
> opinion outright only on the basis of contradictory medical evidence
> and not due to his or her own credibility judgments, speculation, or lay
> opinion." Morales v. Apfel, supra at 317.

Morder v. Colvin, 216 F.Supp.3d 516, 528 (M.D. Pa. 2016). In this case, the ALJ's

decision denying benefits to Watkins violated the treating physician rule and there

was a particular lack of coherence to the evaluation and rejection of Dr. Wallace's

2014 treating source opinion. We find this to be troubling given the district court's

earlier decisions with respect to Watkins' first two appeals, which specifically noted

the ALJ's error in her treatment of the treating physician's opinion.

Second, and finally, the primary evidentiary premise for this ALJ decision

collapses under close scrutiny. The ALJ rejected these treating provider opinions

based on lack of abnormal examination findings relating to Watkins' fibromyalgia.

However, as one court in this district has explained,

> "In stark contrast to the unremitting pain of which fibrositis
> (fibromyalgia) patients complain, physical examinations will usually
> yield normal results—a full range of motion, no joint swelling, as well
> as normal muscle strength and neurological reactions." Lisa v.
> Secretary of the Dep't of Health and Human Services, 940 F.2d 40, 45

42

(2d Cir. 1991). "Because objective tests may not be able to verify a diagnosis of fibromyalgia, the reports of treating physicians, as well as the testimony of the claimant, become even more important in the calculus for making a disability determination." Perl v. Barnhart, No. 03–4580, 2005 WL 579879, at *3 (E.D. Pa. Mar. 10, 2004) (citing Green–Younger, 335 F.3d at 108).

Foley, 432 F. Supp. 2d at 480. Thus, the ALJ's reliance on these examination findings as a basis for discounting a treating source opinion leads us to conclude that the factual underpinning for the ALJ's November 2021 decision fails.

In sum, when considered in combination these flaws in the latest ALJ decision in Watkins' case simply are not amenable to correction through remand. Accordingly, we find that it would be "unreasonable for a court to give the ALJ another opportunity to consider new evidence concerning the disability because the administrative proceeding would result only in further delay in the receipt of benefits." Podedworny, 745 F.2d at 221–22. Thus, we will reverse the decision of the Commissioner and direct that the Commissioner award benefits for the closed period of disability in this case. In doing so, however, we note the very fact-specific nature of this determination which is rooted in the unique circumstances of this case.

## IV.   Conclusion

While we are mindful of the importance of deference to agency decision-making, we recognize that finality and fairness are cardinal virtues of our legal system, virtues which may on occasion call upon us to forego deference when

prolonged agency litigation has led to what are admittedly flawed outcomes and a claimant's entitlement to relief is clear.

So it is in the instant case. We find that it is now time for this painfully prolonged litigation to draw to a close. Concluding that the exacting requirements set by law or an award of benefits are met under the extraordinary circumstances of this case, it will be ordered that judgment be entered in favor of the plaintiff and the Commissioner be directed to award benefits in this case.

An appropriate order follows.

/s/ *Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

Dated: February 21, 2023